All right, the next case is number 20, 1971, Henry Re SoftView LLC. Mr. Burnett, please proceed. May I please the court? Allen Burnett, representing Appellant SoftView LLC. This, all rejections on appeal cannot stand and must be reversed. I would like to begin with the prima facie case of obviousness, which was not established for any claims and in particular was not established for Claim 1 by either the examiner during prostitution or by the PCAB decision. There are a couple elements in Claim 1 that are not even addressed, and those elements include a limitation to a mobile device and a limitation to a touch-sensitive display. I would like to also go in and discuss briefly claim construction. So the scope of Claim 1, if I can draw your attention to page 25 of the blue brief, is a pictorial representation of what is being claimed in Claim 1. And what that's showing is a New York Times Web page as it sits on the New York Times Web server and how that page is rendered on an emulation of a wireless device running the SoftView software. And in this case, if you look at page 25 of the blue brief. Okay. Okay. So what needs to be focused on here is what is being preserved. And the only rational way you can interpret this claim is the HTML-based Web client defining the original page layout functionality design that is received, because all of what is received is translated, and then that is what's preserved. Mr. Burnett, this is just Toronto. Can I ask you this question? Yes. Doesn't the claim cover the simplest imaginable Web page? A claim reads on something where the Web site is a single page with five words and a rectangle. And if that's preserved, then the claim element is satisfied. You don't need anything as complicated as the very complicated front page of the New York Times. Yes. Yes, you're correct. So why doesn't the prior art that was relied on here with the testimony suffice to establish that now hypothetical, incredibly simple, dull HTML Web page would be preserved in what is taught in the record that's relied on? So in that particular page, there is evidence on the record that there is no way to confirm whether that page is actually rendered correctly. In the director's brief, the director acknowledges that and then says, at the very least, it suggests preserving it. Now, your question goes to is that not enough? Is it not enough for POSITA to combine the suggestion of? It is, and I'm going to segue into that, the motivation to combine, because that's very important here. So as KSR has held, this consideration must be whether a POSITA would combine the references to obtain the claimed invention at the time of the invention, not at any other time, at the time of the invention, which is in the 2000-2001 time frame. Right, but just to cut to the chase, don't you have this giant problem that the references themselves say, this would be really useful for personal digital assistance? No. Why is that not significant? No. Okay, so that is significant as applied to Add++. It is not significant as applied to the browser, because there's never any statement as acknowledged by the director anywhere where any assertion is made as it would be desirable to have the browser. Does the claim speak of a browser? Well, it speaks of a Web page that's being preserved. So that implies the use of a Web browser to do so. So let me draw your attention to page 32. Are the hyperlinks preserved? The hyperlinks under Add++ were preserved. Yes. Why isn't that enough? Can I proceed with the motivation to combine? Sure. Okay, so on page 32 of the blue brief is a set of renderings that is using Add++, the window port of the software, of an exemplary set of pages. And this is what a faceta would do in 2000-2001 time. You're looking and you're suggesting if you're going to combine Add++ or the things at Add++ in 2001. And my objective here is, in 2001, is to render pages that are commonly viewed on the Internet in 2001 on any size device, including a mobile device, in the claim or through a mobile device. So I want to clarify, this is not KSR-level subject matter. And what I mean by that, under KSR, a simple substitution of an electronic sensor in the location of a device, that might take a skilled proceed in the mechanical part, you know, perhaps a week to figure out. This is a case where you're looking at, if this faceta is going to port Add++ to a PDA, they're looking on the level of a year or more man years of effort with an extraordinary level of experimentation. That's why I just want to come back to what I asked about. It seems to me you had a lot of very persuasive evidence that it was a major effort to make a commercially useful, you know, Zoom-type product for users to be able to use across the universe or even some significant part of the universe of web pages. But the claim doesn't require that. The claim would be satisfied by a simple page that was nothing other than what Ben Peterson's homepage with, you know, seven lines or nine lines of text on it that is shrunk down to appear on the small PDA screen with the same indentations and line spacing. Why is that? Which I think, I gather that's essentially what the board said and what's relied on in the government's... Well, that's what they're relying... Okay, so then they're looking at motivations combined and part of the motivations combined is centered around a false statement that is demonstrably false in the paper of Peterson 5 where he said that it's being designed and not was designed but is being designed to operate on and that included a PD. Ben Peterson himself acknowledged that was not a true statement, that what it was targeted for was Linux and systems running X Windows on a desktop. And that's confirmed also in Peterson 4, which is actually the paper that describes in detail what they actually implemented. But if I could go to draw your attention to page 32 of the blue brief, and it's showing what the rendering of these pages look like. And folks see that before they're going to spend an inordinate amount of time and inordinate effort because in the end they have to obtain the claimed invention. So they have to... This has to be on a mobile device. Before they do that, they're going to... Especially in the case where the software is downloadable, they're going to test it and they're going to look and see, okay, what am I going to end up with the result? So the result at the end is this is what the pages would look like. There would be zero commercial motivation to do this. There would be no motivation for a faceta to do this. KSR has mentioned the consideration of market conditions or motivation by market forces. There would be none. There's just no motivation here. In addition, as argued elsewhere in both the opening and reply brief, is that it would be inoperative. It would be unusable. So to give you an example, I trust that all of you are familiar with deep-pinch zooming on, say, an iPhone or an Android device. So imagine if you did a deep-pinch zoom and you moved your fingers and nothing happened, nothing changed, and then 20 seconds later, there was an arbitrary different zoom level. That would be completely unusable. How are you going to control? You want to zoom in on something. How would you be able to do that? And that would be the result, that 20 seconds in this example, on the fastest PDA processor available at the time of the invention. The other thing I want to look at, and this applies, this does roll into Claim 1 and it applies to Claim 2, which is to a mobile phone, is that the board did not, for those claims, for Claim 2, did not back up the examiner. They came up with their new ordinary creativity rejection, because they realized... Please continue your thoughts. Okay. So they realized that they couldn't support the examiner's rejection, so they came up with this creative, a facet of using ordinary creativity would have changed the technical requirements and the director raised this a level further and saying they would have matched it to their requirements. And in doing so, they're basing that on testimony of Scott Forstall from Apple, of what Apple did, has a huge team of engineers five to six years later. It's not tied to any rational basis. It also doesn't identify any PDA. I mean, the expectation is that somehow this person of ordinary skill in the art would create a processor that didn't exist and implement it in a PDA that didn't exist, using an operating system that they don't identify, using a browser that they don't identify. I mean, I just cannot, Sofie argues that you cannot establish a case of obviousness in view of personal web versus Apple in other presidential cases of this court, based on that rationale. Okay. Any questions for Mr. Burnett at the moment? I'd like to reserve the rest for rebuttal. Thank you. Yes. Now you have your rebuttal time. All right, Mr. Foreman. Thank you. And may it please the court. First, I'd like to address the preserving limitation, which was just discussed by the panel. The preserving limitation requires that the original page layout and functionality and design of the website must be preserved after doing the PAD++ shows this in the PAD++ tour reference appendix pages, 1067 through 1069. And it shows the simple Ben Bederson homepage in a normal view. And then the same page in a zoomed in view with the layout preserved and hyperlinks preserved. And I think the discussion about whether PAD++ needs to be able to render every website in existence at the time is misleading because, you know, there's evidence here that this website could be preserved and that's certainly sufficient to meet the claim limitation. So I don't think there's any question about the preserving limitation. And, you know, in our brief, we said, you know, even, even if it was questionable, then there's at least the suggestion here of the preserving limitation, which is all that's required in an obviousness analysis. The next issue I'd like to discuss is the motivation combined. I mean, here we have about as clear of a motivation combined as you're going to get in the case where the references themselves, multiple places are telling the reader that PAD++ would be ideal for a PDA. So for example, you know, the references say that the system is designed to operate on platforms ranging from high-end graphics workstations to PDAs, and that PAD++ was created to provide effective access to information on smaller displays and that the system would be especially attractive for devices with small screens, such as PDAs. And I think regardless of what was actually done with PAD++, you have to take the references for what they say at face value. And these references are pointing a skilled artisan directly to the claimed invention to run a zoomable browser on a PDA. I guess going to- Does it matter in your view that the claim language doesn't use the term browser? I think Mr. Burnett, I think, I mean, he indicated yes, it doesn't, but it does implicitly because the software that's being talked about in the claim, browser is just a shorthand word for that. Well, I think the claim clearly requires displaying web content, and a browser is what is commonly used to display web content, especially in the 2001 timeframe. So I don't see an issue with that. What about his point that on motivation, nobody would have, I'm not quite sure how to make the point, but I think it is something like a skilled artisan would not have had the motivation to go down this path because there is no bang for the buck, unless you went through the kind of development effort to do what Apple, for example, ultimately did. And that requires being able to do kind of the, to get this to work on some very, very wide range of web material that handheld device users would want access to. Something like that. So I guess I have a couple of responses. First, this seems like an argument that wasn't really raised or developed in the brief, that motivation combined is tied to a commercial aspect, that the product would need to be commercially viable. There would need to be evidence that it would be commercially viable in order to make the combination. Second, I don't think we have evidence on that point at all. I mean, we have evidence from software use experts about their attempts to run the Pad++ software on a pared down processor, but that doesn't necessarily go to this point about commercial viability. And I guess third of all, you know, there was some discussion about, you know, the board allegedly relying on testimony from Mr. Forstall and Apple. And I don't know where, I'm confused by that. I don't know where that comes from because I think that, you know, there was testimony introduced, but, you know, about, you know, Apple's difficulties and the amount of time Apple spent making the iPhone, but, you know, the board said that that testimony wasn't necessarily relevant to the obviousness analysis here. And, you know, that's the point that we made in our brief, that just because it took Apple a long time to create its, you know, fully formed, commercially viable iPhone product, that doesn't, you know, tell you one way or the other whether these claims are obvious in view of the Moving on to the issue of reasonable expectation of success, you know, as this course has made clear, it doesn't have to be, there doesn't need to be certain, there doesn't have to be evidence of certainty. It just has to be reasonable. And I think that the evidence we have here that, you know, the references themselves suggest running this on a PDA, you have testimony from Professor Peterson saying that a PDA is just a general purpose computer and that, in his view, you know, certainly by the 1999 timeframe, which is still two years prior to 2001, the relevant 2001 date that we have here, that it would have been possible to run Ad++ on a PDA. That's sufficient to meet the reasonable expectation of success. And that, you know, the testimony or the evidence that Sophie wants to rely on where they were able to download a copy of Ad++, you know, that was, that was never designed or intended for a PDA and try to run it on a simulated device that, or a device that would simulate, you know, the conditions of a PDA that, I mean, that's as clear of a case of bodily incorporation as possible. And this court has on numerous occasions said that the obviousness of analysis does not require bodily incorporation. So the idea that one of ordinary skill in the art would just take the existing Ad++ software, not do anything to it, not try to make any modifications to it and just stick it on a PDA. And if it works, you know, that, that would show obviousness. And if it didn't work, it wouldn't show obviousness. I mean, that's, that's just not the analysis. That's not, not the test. So I think that a lot of this testing is just irrelevant to the analysis. And, you know, even if the testing is relevant, I mean, it shows that it did perform the zooming, you know, that the experts said that the zooming was slow and somewhat unpredictable, but, you know, there's no, there's no speed requirements in the claim or any, any other metrics required in the claim. I mean, the metrics that thought he was relying on come from the pad plus plus references. And those were, were explicitly stated as, you know, intended requirements, but not, not necessary requirements. And so this idea that because the, the testing didn't show a fast animation rate that, you know, that means there's no reasonable expectation of success. That's, I mean, it's totally divorced from the claim language, which is nothing about animation rate. And so I think judge Toronto was talking about earlier that, you know, even though it doesn't have to, the claim doesn't require a perfectly commercially polished product. It just requires that, that, you know, the, there'll be zooming in and zooming out while preserving the website and the zooming in and out are done slower than is commercially acceptable, especially to what we, what we expect now with iPhones. And I mean, that, that doesn't affect the office analysis. I guess one last point I want to make is that there was this argument that well, the references to a PDA and the pad plus plus articles only talk about, don't talk about it in the context of the pad plus plus browser. And I think that that's, that's, it's not really a relevant argument because they're talking about pad, pad plus plus is what they call a zoo. It's a zooming user interface and it had multiple applications that use the zooming user interface. One of which was just had plus plus browser. So the fact that the references say, well, the zooming user interface would be useful on a, on a PDA means that I read it as any application running the, the zooming user interface would be, would be beneficial on a PDA and that includes the browser. So the fact that the P the references to the PDA don't, don't appear in the specific parts of the, of the documents discussed in the browser browser, don't disqualify those references. So I have a, I have nothing further. I'm happy to answer any questions of the panel. Any more questions, Mr. Foreman? No, no. Okay. Thank you, Mr. Burnett. You have your rebuttal time. Thank you. First of all the directors just, just said that there was no argument concerning marketplace demand or anything related to that. I draw your attention to page 21 of the gray brief, the reply brief. And it specifically says, it specifically identifies that TSR explains that the facts relative to whether rational combining exists include the effects of demands known to the design community or present in the marketplace. Further on the same page, just above that, Ben Peterson acknowledged that they dropped development of the browser. There's a question, what did you do with the browser? And they said, since 1995, the web has advanced greatly and we realized that we didn't want to get into the business of competing with major web browser companies. That's a polite way to say there's zero chance. They would have been able to do that. And this was in, he was recognizing this statement about 1998. Between 1995 and 2000, HTML went from something extremely simple to something very complicated and requiring with the standardization of HTML4 and cascading style sheets too. This is what I proceed at the time of the invention would want to support. Secondly, with respect to the comment regarding Scott Forstall, in the appeal board decision, it correctly addresses that. At page 18, which is appendix page 18 as well, they discuss what Forstall identified were problems. And then in the following page, they say, according to ordinary skill in the art and demonstrating ordinary creativity, would experiment with the technical features, window size, touch interface, performance, processor, speed of data, and memory such that Pad++ could run on a mobile device. And then they even say the iPhone. The iPhone was seven years later. And then following that, they say, they recognize that the art of record, which is the Apple, Newton, and Nokia communicator in a Palm 7, it says even if the patent owner is correct that there is a lack of motivation to combine Pad++ with a mobile phone, they identify Apple phone and then Apple, Nokia, Palm. It says Apple, Nokia, and Palm are cumulative references. The evidence was it wouldn't be able to be used with those, not by just a small amount. The nearest one was 2,700 times too slow to meet the animation requirements. If you drop the animation requirements, which are 10 frames per second, if you drop those to one frame per second, it's still 270 times slower. Finally, I want to address this comment with regard to the software. May I continue? Sure. Okay. So with regard to the software, what that modeling represented is if someone implemented the software based on the design, which is actually reflected more than better than anything else by the source code, this is the expectation they would see. This is actually something that Fofita, again, would do before expending a year worth of effort. They're going to look at it and say, wow, this is, you know, it's designed to run on a Pentium Pro PC with a numeric processing unit, and we're considering on a mobile device without that, and they're going to immediately recognize, no, it's not going to be possible to implement this. We're not even going to go down that road. Okay. Any more questions, Mr. Burnett? No, ma'am. Okay. Thank you. Thanks to both counsel. The case is taken under submission. The honorable court is adjourned until tomorrow morning at 10 a.m.